**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | | |
|---|---|---|
| IN RE | * | Case No. 10-94166 |
| | * | |
| THE HAMMER CORPORATION, | * | Chapter 11 |
| | * | |
| Debtor. | * | |
| | * | |

## INTERIM MOTION TO APPROVE POST PETITION FINANCING

COMES NOW, THE HAMMER CORPORATION (the "Company" or the "Debtor") and files this Motion to Approve Post Petition Financing (the "Motion"), wherein Debtor seeks an Interim Order ("Interim Order") authorizing the Debtor to obtain post-petition financing (the "DIP Financing") provided by LSQ Funding Group, L.C. ("Secured Party").

The Debtor filed its petition for relief under Chapter 11, Title 11 of the United States Code (the "Bankruptcy Code") on November 12, 2010 (the "Petition Date"). The Debtor operates a candy manufacturing company. The Debtor continues to operate its business as debtor in possession per 11 U.S.C. §§ 1107 and 1108.

### A. SUMMARY OF RELIEF REQUESTED

The Debtor is seeking authority to secure post-petition financing to provide necessary support for maintenance of Debtor's operations and to allow for Debtor to reorganize. The precipitous economic downturn has caused Debtor to seek the protections of Chapter 11 to continue with its reorganization efforts. After arms-length discussions, the Debtor has negotiated for post-petition financing with the Secured Party, which is a pre-petition lender to the Debtor.

349409-1

The Debtor and Secured Party are parties to the Factoring and Security Agreement dated June 24, 2004, Amendments to the Factoring and Security Agreement dated January 1, 2009, January 14, 2010, June 18, 2010, and the Inventory Loan Agreement dated May 04, 2006 (collectively, the "Pre-Petition Agreement"), copies of which is attached as Exhibit A, pursuant to which the Debtor sold its accounts to Secured Party and obtained working capital financing from the Secured Party.

The Pre-Petition Agreement provides for advances by Secured Party to the Debtor, so long as such advances do not cause the ratio of the Debtor's obligations to Secured Party to the value (as determined in the Pre-Petition Agreement) of the Debtor's eligible (as determined in the Pre- Petition Agreement) collateral to exceed that set forth in the Pre-Petition Agreement (the "Formula"). As of the Petition Date, the Debtor was indebted to the Secured Party in the amount of at least $1,681,317.31 (the "Pre-Petition Obligation") secured by the collateral described in the Pre- Petition Agreement.

The Debtor has offered to assign its accounts to Secured Party under the Pre-Petition Agreement and Secured Party has agreed to consider purchasing accounts from the Debtor pursuant thereto. The Secured Party has agreed to continue to provide working capital to the Debtor in accordance with the Pre-Petition Agreement. The Debtor, notwithstanding its efforts to do so, is unable to obtain unsecured credit allowable under 11 U.S.C. Section 503(b)(1) as an administrative expense, or other than pursuant to 11 U.S.C. Section 364(c)(2) and (3), and the Debtor is unable to obtain credit on terms equal to or more favorable than those proposed by Secured Party. Secured Party has agreed to consider providing working capital to the Debtor in accordance with the Pre-Petition Agreement in good faith, within the meaning of 11 U.S.C. Section 364(e).

### B. SUMMARY OF PROPOSED DIP FINANCING TERMS

The proposed post-petition financing ("DIP Financing") is being offered by the Secured Party. A condition of extending the post-petition financing is a certain "carve-out" for the professional fees and expenses of the Debtor's counsel. A further condition of the financing provides that the Debtor will not apply cash proceeds from inventory acquired by the Debtor in the post-petition period to reduce the Debtor's pre-petition obligation to Secured Party. The Secured Party shall have a superpriority administrative expense claim subject only to the "carve-out" which shall mean $100,000 of administrative expenses incurred by the Debtor for the professional fees and expenses of its counsel.

### C. DISCLOSURE OF FINANCING TERMS PURSUANT TO BANKRUPTCY RULE 4001

Pursuant to Federal Rule of Bankruptcy Procedure ("Bankruptcy Rule") 4001, the Debtor Makes the following disclosures as to the terms and conditions contained in the DIP Agreement:

(a)     The proposal provides that should Debtor become indebted to any governmental entity, whether for payroll or other taxes or otherwise, and said governmental entity is also an account debtor of the Debtor, the governmental entity's right of setoff, defense, counterclaim or recoupment, if any, shall be subordinate to the rights of Secured Party with respect to accounts owing to the Debtor which comprise a portion of the Collateral, and the governmental entity shall pay the amount owing on the account free of any claim of setoff or recoupment.

349409-1

(b)    Debtor shall pay to the Secured Party on demand without application to the Court (but subject to review by the Official Committee of Unsecured Creditors or the U.S. Trustee,) Secured Party's reasonable attorneys fees and other professional fees arising from or related to the transactions contemplated herein, including without limitation the negotiating, closing, documenting, and obtaining Court approval thereof, the enforcement of Secured Party's rights against Debtor.

(c)    The proposal allows the Secured Party to record the pre-petition transactions and the post-petition transactions arising under the Pre-Petition Agreement in one account, and apply payments on a "first in, first out" basis.

(d)    The proposal provides that the Secured Party shall be the owner of Accounts purchased under the Pre-Petition Agreement and the purchased Accounts and all proceeds there from shall be the sole property of Secured Party, and will not, when purchased by Secured Party, constitute property of the estate, and shall be free and clear of any claims.

(e)    The proposal provides that nothing in the Pre-Petition Agreement, or in any of the documents executed in connection therewith shall require Secured Party to purchase accounts from the Debtor, or to provide working capital to the Debtor, such being in the sole discretion of Secured Party.

(f)    The proposal provides that Debtor shall comply with all provisions of the Pre-Petition Agreement.

(g)     The proposal provides that Debtor shall not grant to any party any interest in

the Collateral or priority in payment prior to or equal with the lien or priority

in payment hereby being accorded to Secured Party

(h)     The proposal grants to the Secured Party relief from the automatic stay

provisions of 11 U.S.C. Section 362 to permit Secured Party to demand and

receive collections on account of the Collateral, and to apply those collections

to the Obligations. Notwithstanding the foregoing, the proposal does not grant

the Secured Party relief from the automatic stay to enforce any remedies

against the Debtor that may be afforded under the Pre-Petition Agreement.

(i)     The Debtor will not seek to surcharge the Secured Party or its collateral with

any expenses of the type described in Section 506(c) or 552(b) of the

Bankruptcy Code unless it obtained Secured Party's prior written consent to

the incurrence of such expenses.

On this 12th day of November, 2010.

Respectfully submitted,

MACEY, WILENSKY, KESSLER
& HENNINGS, LLC

Frank B. Wilensky
Georgia Bar No. 758700
Vania S. Allen
Georgia Bar No. 558756
Attorneys for Debtor

230 Peachtree Street, N.W.
Suite 2700
Atlanta, Georgia 30303
(404) 584-1200—Telephone
(404) 681-4355—Fax
fwilensky@maceywilensky.com
vallen@maceywilensky.com

349409-1

JUN-22-2004  03:50       THE HAMMER CORPORATION                    4046954003   P:02/15

## FACTORING AND SECURITY AGREEMENT

THIS FACTORING AGREEMENT is made as of 6-24-04 by and between Innovative Candy Concepts, LLC ("Seller") and LSQ FUNDING GROUP L.C. ("Purchaser").

1. **Sale: Purchase Price: Billing: Reserve.**

    1.1. **Assignment and Sale.**

        1.1.1. Seller shall offer to sell to Purchaser as absolute owner such of Seller's Accounts as are listed from time to time on a Schedule of Accounts.

        1.1.2. Each Schedule of Accounts shall be accompanied by such reasonable documentation supporting and evidencing the Account as Purchaser shall from time to time reasonably request.

        1.1.3. Purchaser shall purchase from Seller such Accounts as Purchaser determines to be Eligible Accounts, so long as the Balance Subject to Funds Usage Fee does not exceed, before and after such purchase, the Maximum Amount.

        1.1.4. Purchaser shall pay the Purchase Price, less any amounts due to Purchaser from Seller, including, without limitation, any amounts due under Section 1.3.2 hereof, of any Purchased Account, to Seller's Deposit Account within one (1) Business Day of the Purchase Date, whereupon such Account shall be deemed purchased hereunder.

    1.2. **Billing.** Purchaser may send a monthly statement to all Account Debtors itemizing their account activity during the preceding billing period. All Account Debtors will be instructed to make payments to Purchaser.

    1.3. **Reserve Account.**

        1.3.1. Purchaser may apply a portion of any Purchase Price to the Reserve Account in the amount of the Reserve Shortfall.

        1.3.2. Seller shall pay to Purchaser, within three (3) days of demand, the amount of any Reserve Shortfall.

        1.3.3. Purchaser shall pay to Seller upon Seller's request, any amount by which the Reserve Account exceeds the Required Reserve Amount.

        1.3.4. Purchaser may charge the Reserve Account with any Obligation, including any amounts due from Seller to Purchaser hereunder.

        1.3.5. Purchaser may pay any amounts due Seller hereunder by a credit to the Reserve Account.

Initial_____

This Factoring Agreement is at all times subject to the liens in favor of Fleet Capital Corporation.

2. <u>**Authorization for Purchases**</u>.  Subject to the terms and conditions of this agreement, Purchaser is authorized to purchase Accounts upon telephonic, facsimile, or other instructions received from anyone purporting to be an officer, employee, or representative of Seller.

3. <u>**Fees and Expenses**</u>.  Seller shall pay to Purchaser:

3.1. **Factoring Fees**.

3.1.1. <u>Initial Fee</u>.  the Initial Fee, payable in consideration of the rendering of the Credit and Collection Services, which will be deducted from the Purchase Price.

3.1.2. <u>Funds Usage Fee</u>.

3.1.2.1. A Funds Usage Fee, earned daily, to be paid monthly on the last day of the month in which it accrues.

3.1.2.2. Notwithstanding Section 3.1.2.1, the Funds Usage Fee shall not accrue and be payable on any funds subject to the Default Charge.

3.1.3. <u>Discount Service Fee</u>.

3.1.3.1. A Discount Service Fee, charged on the face amount each invoice purchased and earned daily, to be paid monthly on the last day of the month in which it accrues.

3.2. **Other Fees**.

3.2.1. <u>Misdirected Payment Fee</u>.  any Misdirected Payment Fee immediately upon its accrual.

3.2.2. <u>Default Charge</u>.  the Default Charge, immediately upon its accrual, on:

3.2.2.1. all past due amounts due from Seller to Purchaser hereunder; and

3.2.2.2. the amount of any Reserve Shortfall.

3.2.3. <u>Early Termination Fee</u>.  the Early Termination Fee if Seller terminates this agreement prior to a termination date set forth in Section 13.

3.2.4. <u>Missing Notation Fee</u>.  The Missing Notation Fee on any Invoice that is sent by Seller to an Account Debtor which does not contain the notice as required by Section 8.3 hereof.

3.3. **Reimbursable Expenses**.  The expenses directly incurred by Purchaser in the administration of this agreement such as wire transfer fees, overnight mail delivery, check certification, UCC filing and search fees, and audit fees.  These fees are due immediately upon payment by Purchaser.

4. <u>**Repurchase Of Accounts**</u>.

2

Initial_____

4.1. Purchaser may require that Seller repurchase, by payment of the unpaid Face Amount thereof together with any unpaid fees relating to the Purchased Account on demand, or, at Purchaser's option, by Purchaser's charge to the Reserve Account:

4.1.1. any Purchased Account, the payment of which has been disputed by the Account Debtor obligated thereon, Purchaser being under no obligation to determine the bona fides of such dispute;

4.1.2. Any Purchased Account for with Seller has breached its warranty under Section 11 hereunder.

4.1.3. Any Purchased Account owing from an Account Debtor which in Purchaser's reasonable credit judgment has become insolvent.

4.1.4. all Purchased Accounts upon the occurrence of an Event of Default, or upon the effective date of termination of this agreement;

4.1.5. any Purchased Account which remains unpaid beyond the Late Payment Date.

4.2. The repurchase of a Purchased Account shall not constitute a reassignment thereof and Purchaser shall retain its security interest therein.

**5. Clearance Days.** For all purposes under this agreement, Clearance Days will be added to the date on which any payment is received by Purchaser.

**6. Security Interest.**

6.1. To secure payment and performance of the Obligations, Seller grants to Purchaser a continuing first priority security interest in and to the Collateral.

6.2. Notwithstanding the creation of the above security interest, the relationship of the parties shall be that of Purchaser and Seller of accounts, and not that of lender and borrower.

**7. Authorization to Purchaser.**

7.1. Seller hereby irrevocably authorizes Purchaser and any designee of Purchaser, at Seller's sole expense, to exercise at any times in Purchaser's or such designee's discretion all or any of the following powers until all of the Obligations have been paid in full: (a) receive, take, endorse, assign, deliver, accept and deposit, in the name of Purchaser or Seller, any and all cash, checks, commercial paper, drafts, remittances and other instruments and documents relating to the Collateral or the proceeds thereof, (b) take or bring, in the name of Purchaser or Seller, all steps, actions, suits or proceedings deemed by Purchaser necessary or desirable to effect collection of or other realization upon the accounts and other Collateral, (c) after an Event of Default, change the address for delivery of mail to Seller and to receive and open mail addressed to Seller, (d) after an Event of Default, extend the time of payment of, compromise or settle for cash, credit or return of merchandise, upon any terms or conditions acceptable to Purchaser, any and all accounts or other Collateral which includes a monetary obligation and discharge or release any account debtor or other obligor (including filing of any public record releasing any

3

Initial_____

JUN-22-2004  03:51          THE HAMMER CORPORATION          4046964003   P.05/15

Lien granted to Seller by such account debtor), without affecting any of the Obligations, (e) execute in the name of Seller and file against Seller in favor of Purchaser financing statements or amendments with respect to the Collateral, (f) pay any sums necessary to discharge any Lien or encumbrance which is senior to Purchaser's security interest in the Collateral, which sums shall be included as Obligations hereunder, and in connection with which sums the Default Charge shall accrue and shall be due and payable, and (g) file in the name of Seller or Purchaser or both (1) mechanics lien or related notices, or (2) claims under any payment bond, in connection with goods or services sold by Seller in connection with the improvement of realty, (h) at any time, irrespective of whether an Event of Default has occurred, without notice to or the assent of Seller, notify any Account Debtor obligated with respect to any Account, that the underlying Account has been assigned to Purchaser by Seller and that payment thereof is to be made to the order of and directly and solely to Purchaser, and (i) communicate directly with Seller's Account Debtors to verify the amount and validity of any Account created by Seller.

7.2. Seller hereby releases and exculpates Purchaser, its officers, employees and designees, from any liability arising from any acts under this agreement or in furtherance thereof whether of omission or commission, and whether based upon any error of judgment or mistake of law or fact, except for willful misconduct. In no event will Purchaser have any liability to Seller for lost profits or other special or consequential damages. Without limiting the generality of the foregoing, Seller releases Purchaser from any claims which Seller may now or hereafter have arising out of Purchaser's endorsement and deposit of checks issued by Seller's customers stating that they were in full payment of an account, but issued for less than the full amount which may have been owed on the account.

7.3. Seller authorizes Purchaser to accept, endorse, and deposit on behalf of Seller any checks tendered by an account debtor "in full payment" of its obligation to Seller. Seller shall not assert against Purchaser any claim arising therefrom, irrespective of whether such action by Purchaser effects an accord and satisfaction of Seller's claims, under §3-311 of the UCC, or otherwise.

7.4. ACH Authorization. In order to satisfy any of the Obligations, Purchaser is hereby authorized by Seller to initiate electronic debit or credit entries through the ACH system to Seller's Account or any other deposit account maintained by Seller wherever located. Seller may only terminate this authorization by giving Purchaser thirty (30) days prior written notice of termination. Notwithstanding the above, Purchase agrees not to make electronic debits from any account which holds funds exclusively used to satisfy current period payroll tax obligations.

## 8. Covenants By Seller.

8.1. After written notice by Purchaser to Seller, and automatically, without notice, after an Event of Default, Seller shall not, without the prior written consent of Purchaser in each instance, (a) grant any extension of time for payment of any of the Purchased Accounts, (b) compromise or settle any of the Purchased Accounts for less than the full amount thereof, (c) release in whole or in part any Account Debtor, or (d) grant any credits, discounts, allowances, deductions, return authorizations, or the like with respect to any of the Purchased Accounts.

4

Initial_____

8.2. From time to time as requested by Purchaser, at the sole expense of Seller, Purchaser or its designee shall have access, during reasonable business hours if prior to an Event of Default and at any time if on or after an Event of Default, to all premises where Collateral is located for the purposes of inspecting (and removing, if after the occurrence of an Event of Default) any of the Collateral, including Seller's books and records, and Seller shall permit Purchaser or its designee to make copies of such books and records or extracts therefrom as Purchaser may request. Without expense to Purchaser, Purchaser may use any of Seller's personnel, equipment, including computer equipment, programs, printed output and computer readable media, supplies, and premises for the collection of Accounts and realization on other Collateral as Purchaser, in its sole discretion, deems appropriate. Seller hereby irrevocably authorizes all accountants and third parties to disclose and deliver to Purchaser at Seller's expense all financial information, books and records, work papers, management reports, and other information in their possession relating to Seller.

8.3. Before sending any invoice evidencing a Purchased Account to the Account Debtor, Seller shall mark same with a notice of assignment as may be required by Purchaser.

8.4. Seller shall pay when due all payroll and other taxes and shall provide proof thereof to Purchaser in such form as Purchaser shall reasonably require.

8.5. Seller shall not create, incur, assume, or permit to exist any Lien upon or with respect to any Collateral now owned or hereafter acquired by Seller.

8.6. Seller shall maintain insurance on all insurable property owned or leased by Seller in the manner, to the extent and against at least such risks (in any event, including but not limited to fire and business interruption insurance) as usually maintained by owners of similar businesses and properties in similar geographic areas. All such insurance shall be in amounts and form and with insurance companies acceptable to Purchaser in its sole discretion. Seller shall furnish to Purchaser: (a) upon written request, any and all information concerning such insurance carried; (b) as requested by Purchaser, lender loss payable endorsements (or their equivalent) in favor of Purchaser. All policies of insurance shall provide for not less than thirty (30) days prior written cancellation notice to Purchaser.

8.7. Notwithstanding that Seller has agreed to pay the Misdirected Payment Fee pursuant to Section 3.2.1 hereof, Seller shall deliver in kind to Purchaser, not more than three (3) Business Day following the date of receipt by Seller of the amount of any payment on account of a Purchased Account.

8.8. Avoidance Claims.

8.8.1. Seller shall indemnify Purchaser from any loss arising out of the assertion of any Avoidance Claims. Seller shall indemnify Purchaser for such losses within 2 Business Days of written demand being made upon Seller, such written demand to be supported by documentation evidencing the loss, at the address set forth in Section 29. The foregoing notwithstanding, Seller shall have no obligation to indemnify Purchaser for any loss suffered by Purchaser from a judgment by default.

5

Initial_____

8.8.2. In the event an Avoidance Claim is brought against either Seller or Purchaser or both, Seller and Purchaser agree to use commercially reasonable efforts to cooperate with each other in the defense of such Avoidance Claim. Each of Seller and Purchaser shall notify the other within two Business Days of its becoming aware of the assertion of an Avoidance Claim made against either Seller or Purchaser or both.

8.8.3. This Section shall survive the termination of this agreement.

9. **Account Disputes**. Seller shall notify Purchaser promptly of and, if requested by Purchaser, will settle all disputes concerning any Purchased Account, at Seller's sole cost and expense.

10. **Perfection of Security Interest**. Seller shall execute and deliver to Purchaser such documents and instruments, including, without limitation, UCC financing statements, as Purchaser may request from time to time in order to evidence and perfect its security interest in any collateral securing the Obligations.

11. **Representations and Warranties**. To induce Purchaser to enter into this agreement and to purchase the Purchased Accounts hereunder, Seller hereby represents and warrants to Purchaser as follows (each of which representations and warranties shall be deemed to be continuing and to have been restated and reaffirmed on each occasion that Seller submits a Schedule of Accounts to Purchaser):

11.1. it is fully authorized to enter into this agreement and to perform hereunder;

11.2. this agreement constitutes a legal and valid obligation that is binding upon it and that is enforceable against it in accordance with the terms hereof.

11.3. Seller is in good standing in the state of its organization.

11.4. there are no pending actions, suits, or other legal proceedings of any kind (whether civil or criminal) now pending (or, to Seller's knowledge, threatened) against Seller, the adverse result of which would in any material respect affect the property or financial condition, or threaten the continued operations, of Purchaser;

11.5. Seller has not conducted business under or used any other name, whether legal or fictitious, with the exception of the Hammer Corporation;

11.6. each financial statement of Seller provided to Purchaser, whether provided prior to or after the date of this agreement, is true and correct in all material respects.

11.7. The Purchased Accounts are and will remain:

11.7.1. bona fide existing obligation created by the sale and delivery of goods or the rendition of services in the ordinary course of Seller's business; and

11.7.2. unconditionally owed and will be paid to Purchaser without defenses, disputes, offsets, counterclaims, or rights of return or cancellation;

6

Initial_____

11.8. Purchaser has not received notice of actual or imminent bankruptcy, insolvency, or material impairment of the financial condition of any applicable Account Debtor regarding Purchased Accounts.

## 12. Default.

**12.1. Events of Default.** The occurrence or existence of any of the following events or conditions shall constitute an Event of Default hereunder: (a) Seller defaults in the payment of any of the Obligations or in the performance of any provision hereof or of any other agreement now or hereafter entered into with Purchaser, or any warranty or representation contained herein proves to be false in any way, howsoever minor, (b) Seller or any guarantor of any of the Obligations becomes subject to any debtor-relief proceedings, including by way of the commencement of any petition for relief filed by or against Seller or any guarantor under any chapter of the federal bankruptcy laws, (c) any such guarantor fails to perform or observe any of such guarantor's obligations to Purchaser or shall notify Purchaser of its intention to rescind, modify, terminate, or revoke any guaranty of any of the Obligations, or any such guaranty shall cease to be in full force and effect for any reason whatever, (d) Purchaser for any reason, in good faith, deems itself insecure with respect to the prospect of repayment or performance of any of the Obligations.

**12.2. Waiver of Notice.** SELLER WAIVES ANY REQUIREMENT THAT PURCHASER INFORM SELLER BY AFFIRMATIVE ACT OR OTHERWISE OF ANY ACCELERATION OF SELLER'S OBLIGATIONS HEREUNDER. FURTHER, PURCHASER'S FAILURE TO CHARGE OR ACCRUE INTEREST OR FEES AT ANY "DEFAULT" OR "PAST DUE" RATE SHALL NOT BE DEEMED A WAIVER BY PURCHASER OF ITS CLAIM THERETO.

**12.3. Effect of Default.**

12.3.1. Upon the occurrence of any Event of Default, in addition to any rights Purchaser has under this agreement or applicable law:

12.3.1.1. Purchaser may immediately terminate this agreement, at which time all Obligations shall immediately become due and payable without notice, and

12.3.1.2. the Default Charge shall accrue and be payable on any Obligation not paid when due.

**13. Termination; Effective Date.** This agreement will be effective when executed by Purchaser, will continue in full force and effect for one (1) year thereafter, and shall be further annually extended automatically unless Seller shall have given Purchaser written notice of its intention to terminate at least sixty (60) days prior to each such anniversary, whereupon this agreement shall terminate on said anniversary.

**14. Enforcement.** This agreement and all agreements relating to the subject matter hereof are the product of negotiation and preparation by and among each party and its respective attorneys, and shall be construed accordingly. Accordingly, no provision of this agreement shall be construed against or interpreted to the disadvantage of any party hereto by any court or other

7

Initial_____

governmental or judicial party by reason of such party having, or being deemed to have, structured, drafted, or dictated such provision.

**15. Amendment.** Neither this agreement nor any provisions hereof may be changed, waived, discharged, or terminated, nor may any consent to the departure from the terms hereof be given, orally (even if supported by new consideration), but only by an instrument in writing signed by all parties to this agreement. Any waiver or consent so given shall be effective only in the specific instance and for the specific purpose for which given.

**16. No Lien Termination Without Release.** In recognition of the Purchaser's right to have its attorneys' fees and other expenses incurred in connection with this agreement secured by the Collateral, notwithstanding payment in full of all Obligations by Seller, Purchaser shall not be required to record any terminations or satisfactions of any of Purchaser's Liens on the Collateral unless and until Seller has executed and delivered to Purchaser a general release in a form reasonably satisfactory to Purchaser. Seller understands that this provision constitutes a waiver of its rights under §§9-509(d)(2) and 9-513 of the UCC. The above shall apply to all circumstances now or hereafter contemplated, except in the event of the willful misconduct of the Purchaser, as determined in a Court of Law.

**17. Account Stated.** Purchaser shall render to Seller a statement setting forth the transactions arising hereunder. Each statement shall be considered correct and binding upon Seller as an account stated, except to the extent that Purchaser receives, within thirty (30) days after the mailing of such statement, written notice from Seller of any specific exceptions by Seller to that statement, and then it shall be binding against Seller as to any items to which it has not objected.

**18. Conflict.** Unless otherwise specifically stated in any other agreement entered into between Purchaser and Seller hereafter, if a conflict exists between the provisions of this agreement and the provisions of such other agreement, the provisions of this agreement shall control.

**19. Survival.** All representations, warranties, and covenants contained in this agreement shall be and remain effective for so long as this agreement has not been terminated in accordance with its terms or any of the Obligations remain outstanding

**20. No Waiver; Cumulative Nature of Rights and Remedies.** No failure to exercise and no delay in exercising any right, power, or remedy hereunder shall impair any right, power, or remedy which Purchaser may have, nor shall any such delay be construed to be a waiver of any of such rights, powers, or remedies, or any acquiescence in any breach or default hereunder; nor shall any waiver by Purchaser of any breach or default by Seller hereunder be deemed a waiver of any default or breach subsequently occurring. All rights and remedies granted to Purchaser hereunder shall remain in full force and effect notwithstanding any single or partial exercise of, or any discontinuance of action begun to enforce, any such right or remedy. The rights and remedies specified herein are cumulative and not exclusive of each other or of any rights or remedies which Purchaser would otherwise have. Any waiver, permit, consent or approval by Purchaser of any breach or default hereunder must be in writing and shall be effective only to the extent set forth in such writing and only as to that specific instance.

8

Initial_____

21. **Severability**.  In the event any one or more of the provisions contained in this agreement is held to be invalid, illegal, or unenforceable in any respect, then such provision shall be ineffective only to the extent of such prohibition or invalidity, and the validity, legality, and enforceability of the remaining provisions contained herein shall not in any way be affected or impaired thereby.

22. **Relationship of Parties**.  The relationship of the parties hereto shall be that of Seller and Purchaser of Accounts, and Purchaser shall not be a fiduciary of the Seller, although Seller may be a fiduciary of Purchaser.

23. **Reimbursement of Expenses**.  Seller agrees to reimburse Purchaser on demand for the actual amount of all costs and expenses, including attorneys' fees, which Purchaser has incurred or may incur in (a) negotiating, preparing, or administering this agreement and any documents prepared in connection herewith, all of which shall be paid contemporaneously with the execution hereof, and (b) protecting, preserving, or enforcing any Lien, security interest, or other right granted by Seller to Purchaser or arising under applicable law, whether or not suit is brought.  Any such costs and expenses incurred subsequent to the execution hereof shall become part of the Obligations when incurred and may be added to the outstanding principal amount due hereunder.

24. **Entire Agreement**.  This agreement supersedes all prior or contemporaneous agreements and understandings between said parties, verbal or written, express or implied, relating to the subject matter hereof.  No promises of any kind have been made by Purchaser or any third party to induce Seller to execute this agreement.  No course of dealing, course of performance or trade usage, and no parole evidence of any nature, shall be used to supplement or modify any terms of this agreement.

25. **Choice of Law**.  This agreement and all transactions contemplated hereunder and/or evidenced hereby shall be governed by, construed under, and enforced in accordance with the internal laws of the State of Florida.

26. **Construction of Agreement**.  Notwithstanding anything to the contrary set forth in this agreement, in no event shall the rate or amount of fees or other charges that are deemed interest under applicable law and that are charged or collected hereunder exceed the maximum amount chargeable under applicable law (it being the intent hereof that Purchaser not contract or receive and Seller not pay interest in excess of the maximum authorized by applicable law); and, if a court of competent jurisdiction determines that Purchaser has charged or collected interest in excess of the highest lawful rate, Purchaser shall promptly refund such excess to Seller and shall not otherwise be penalized.

27. **JURY TRIAL WAIVER.  IN RECOGNITION OF THE HIGHER COSTS AND DELAY WHICH MAY RESULT FROM A JURY TRIAL, THE PARTIES HERETO WAIVE ANY RIGHT TO TRIAL BY JURY OF ANY CLAIM, DEMAND, ACTION, OR CAUSE OF ACTION (a) ARISING HEREUNDER, OR (b) IN ANY WAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE DEALINGS OF THE PARTIES HERETO OR ANY OF THEM WITH RESPECT HERETO, IN EACH CASE WHETHER NOW EXISTING OR HEREAFTER ARISING, AND WHETHER**

9

Initial_____

SOUNDING IN CONTRACT OR TORT OR OTHERWISE; AND EACH PARTY FURTHER WAIVES ANY RIGHT TO CONSOLIDATE ANY SUCH ACTION IN WHICH A JURY TRIAL HAS BEEN WAIVED WITH ANY OTHER ACTION IN WHICH A JURY TRIAL CANNOT BE OR HAS NOT BEEN WAIVED; AND EACH PARTY HEREBY AGREES AND CONSENTS THAT ANY SUCH CLAIM, DEMAND, ACTION OR CAUSE OF ACTION SHALL BE DECIDED BY COURT TRIAL WITHOUT A JURY, AND THAT ANY PARTY HERETO MAY FILE AN ORIGINAL COUNTERPART OR A COPY OF THIS SECTION WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF THE PARTIES HERETO TO THE WAIVER OF THEIR RIGHT TO TRIAL BY JURY.

28. **Venue; Jurisdiction.** The parties agree that any suit, action, or proceeding arising out of the subject matter hereof, or the interpretation, performance, or breach of this agreement, shall, if Purchaser so elects, be instituted in the United States District Court for the Middle District of Florida or any court of the State of Florida located in Orange County (each an "Acceptable Forum"). Each party agrees that the Acceptable Forums are convenient to it, and each party irrevocably submits to the jurisdiction of the Acceptable Forums, irrevocably agrees to be bound by any judgment rendered thereby in connection with this agreement, and waives any and all objections to jurisdiction or venue that it may have under the laws of the State of Florida or otherwise in those courts in any such suit, action, or proceeding. Should such proceeding be initiated in any other forum, Seller waives any right to oppose any motion or application made by Purchaser as a consequence of such proceeding having been commenced in a forum other than an Acceptable Forum.

29. **Notice.**

29.1. All notices required to be given to any party shall be deemed given upon the first to occur of (i) deposit thereof in a receptacle under the control of the United States Postal Service, properly addressed and postage prepaid, (ii) transmittal by electronic means to a receiver under the control of such party; or (iii) actual receipt by such party or an employee or agent of such party.

29.2. For the purposes hereof, notices hereunder shall be sent to the following addresses, or to such other addresses as each such party may in writing hereafter indicate:

**SELLER**

ADDRESS:        4215 Wendell Drive SW, Suite 203
                Atlanta, GA 30336
OFFICER:        Armand J. Kramedjian

FAX NUMBER:     404-699-0698

**PURCHASER**

ADDRESS:        1403 West Colonial Drive
                Suite B
                Orlando FL 32804

10                                      Initial_____

OFFICER:        Mr. Max Eliscu, President
FAX NUMBER:    407-206-0025

30. **Counterparts.** This agreement may be signed in any number of counterparts, each of which shall be an original, with the same effect as if all signatures were upon the same instrument. Delivery of an executed counterpart of the signature page to this agreement by facsimile shall be effective as delivery of a manually executed counterpart of this agreement, and any party delivering such an executed counterpart of the signature page to this agreement by facsimile to any other party shall thereafter also promptly deliver a manually executed counterpart of this agreement to such other party, provided that the failure to deliver such manually executed counterpart shall not affect the validity, enforceability, or binding effect of this agreement.

31. **Definitions.** The following terms used herein shall have the following meanings. All capitalized terms not herein defined shall have the meaning set forth in the UCC:

31.1. **"Avoidance Claim"** – any claim that any payment received by Purchaser from or for the account of an Account Debtor is avoidable under the Bankruptcy Code or any other debtor relief statute.

31.2. **"Balance Subject to Funds Usage Fee"** - the unpaid Face Amount of all Purchased Accounts minus the Reserve Account.

31.3. **"Business Day"** – a day of the week other than a Saturday, Sunday, or a holiday under which banks located in the State of Florida are required or permitted to be closed.

31.4. **"Clearance Days"** – Three (3) Business Days for all payments.

31.5. **"Collateral"** - all now owned and hereafter acquired personal property and fixtures, and proceeds thereof, (including proceeds of proceeds) including without limitation:

31.5.1. Accounts, including health-care insurance receivables;

31.5.2. Chattel Paper;

31.5.3. Inventory;

31.5.4. Equipment;

31.5.5. Instruments, including Promissory Notes;

31.5.6. Investment Property;

31.5.7. Documents;

31.5.8. Deposit Accounts;

31.5.9. Letter of Credit Rights;

31.5.10. General Intangibles; and

11

Initial_____

31.5.11. Supporting Obligations.

31.6. **"Credit and Collection Services"** - shall include the following services performed by Purchaser on behalf of Seller as a result of the purchase of accounts hereunder:

31.6.1. All accounts receivable record keeping, including the recording of invoices and payments;

31.6.2. Collection of accounts;

31.6.3. Setting of such credit limits for sales by Seller as may be required.

31.7. **"Default Charge"** – The maximum default rate allowable by law

31.8. **"Discount Service Fee"** – The product of the Discount Service Fee Rate and the Face Amount of each Account, calculated daily as long as the invoice is outstanding.

31.9. **"Discount Service Fee Rate"** – 0.042% of the gross face amount of each invoice purchased.

31.10. **"Early Termination Fee"** – N/A.

31.11. **"Eligible Account"** - an Account which is acceptable for purchase as determined by Purchaser in its sole discretion.

31.12. **"Events of Default"** - See Section 12.1

31.13. **"Face Amount"** - the face amount due on an Account.

31.14. **"Funds Usage Fee"** – the product of the Funds Usage Fee Rate and the Balance Subject to Funds Usage Fee.

31.15. **"Funds Usage Fee Rate"** –Two (2.00) percent in excess of the Prime Rate, not less than 6.0%, calculated on the basis of the actual number of days elapsed in a year of 360 days.

31.16. **"Initial Fee"** - the fee earned by Purchaser in consideration of its performance of Credit and Collection Services, computed as the Initial Fee Percentage multiplied by the Face Amount of each Purchased Account.

31.17. **"Initial Fee Percentage"** –0%

31.18. **"Late Payment Date"** – the date which is sixty (60) days from the date on which the Purchased Account was due.

31.19. **"Lien"** - any interest in property securing an Obligation owed to, or a claim by, a person other than the owner of the property, whether such interest is based upon common law, statute, or contract.

31.20. **"Maximum Amount"** – $2,500,000.00.

Initial_____

31.21. **"Misdirected Payment Fee"** - fifteen (15%) percent of the amount of any payment on account of a Purchased Account which has been received by Seller and not delivered in kind to Purchaser within three (3) Business Days following the date of receipt by Seller.

31.22. **"Missing Notation Fee"** — 15% of the Face Amount.

31.23. **"Obligations"** - all present and future obligations owing by Seller to Purchaser whether or not for the payment of money, whether or not evidenced by any note or other instrument, whether direct or indirect, absolute or contingent, due or to become due, joint or several, primary or secondary, liquidated or unliquidated, secured or unsecured, original or renewed or extended, whether arising before, during, or after the commencement of any bankruptcy case in which Seller is a Debtor, including but not limited to any obligations arising pursuant to letters of credit or acceptance transactions or any other financial accommodations.

31.24. **"Prime Rate"** — The prime rate published by The Wall Street Journal, from time to time as its prime rate, whether or not such rate is the lowest or best rate quoted by such bank to its most creditworthy customers. Seller acknowledges that such bank charges interest at, above, and below its announced prime rate.

31.25. **"Purchase Price"** - the unpaid Face Amount of an Account at the time of purchase.

31.26. **"Purchased Accounts"** - Accounts purchased hereunder which have not been Repurchased.

31.27. **"Purchase Date"** — The date on which Seller has been advised in writing that Purchaser has agreed to purchase an Account.

31.28. **"Repurchased"** - an Account has been repurchased when Seller has paid to Purchaser the then unpaid Face Amount.

31.29. **"Required Reserve Amount"** - the Reserve Percentage multiplied by the unpaid Face Amount of Purchased Accounts.

31.30. **"Reserve Account"** - an account or accounts on the books of Purchaser reflecting transactions hereunder.

31.31. **"Reserve Percentage"** —Twenty (20.00) percent, which percent may be revised at any time by Purchaser to protect Purchaser with regard to (i) any indebtedness owing by Seller hereunder, or (ii) possible returns, claims or defenses of any Account Debtor.

31.32. **"Reserve Shortfall"** - the amount by which the Reserve Account is less than the Required Reserve Amount.

31.33. **"Schedule of Accounts"** - a form supplied by Purchaser from time to time wherein Seller lists such of its Accounts as it requests that Purchaser purchase under the terms of this agreement.

13

Initial _____

31.34. **"Seller's Deposit Account"** - any demand deposit account maintained by Seller, or represented by an employee of Seller to be maintained by Seller, wherever located.

31.35. **"Service Charge"** - a fee earned by Purchaser, which, in addition to the Initial Fee is in consideration of its performance of Credit and Collection Services, based on the number of days the Purchased Account is unpaid in whole or in part, computed from the invoice date (each, a "Service Charge Period"), and not Repurchased, as follows:

| Days Unpaid | | Service Charge |
|---|---|---|
| between | and | |
| between | and | |
| between | and | |
| between | and | |

31.36. **Service Charge Period"** - See definition of Service Charge

31.37. **"UCC"** - the Uniform Commercial Code (or any successor statute) as adopted and in force from time to time  in the State of Florida or, when the laws of any other state govern the method or manner of the perfection or enforcement of any security interest in any of the Collateral, the Uniform Commercial Code (or any successor statute) as adopted and in force from time to time in such state.

**IN WITNESS WHEREOF,** the Parties have executed this agreement on the day and year first above written.

SELLER:                                    Innovative Candy Concepts, LLC

                                           By: Armand J. Kramedjian

                                           Name:

                                           Title: _____ President _____

PURCHASER:                                 LSQ FUNDING GROUP L.C.

                                           By: _____

                                           Name: Maxwell Elison

                                           Title:  Manager

14                                          Initial _____

## INVENTORY FINANCING AGREEMENT

This **INVENTORY FINANCING AGREEMENT** ("Agreement") is dated as of _____ _05-04-06_ by and between **Innovative Candy Concepts, LLC** ("Debtor") and **LSQ Funding Group L.C.** ("Secured Party").

## RECITALS

A.  Debtor and Secured Party are parties to the Factoring Agreement pursuant to which Secured Party purchases Accounts from Debtor.

B.  Debtor has requested that Secured Party make loans to Debtor to enable Debtor to acquire and carry inventory.

C.  Secured Party is willing to make said loans to Debtor so long as such loans do not exceed a agreed to percentage of Debtor's eligible inventory, as set forth herein.

NOW, THEREFORE, in consideration of the premises, and intending to be legally bound hereby, the Parties hereby agree as follows:

## AGREEMENT

## 1. CERTAIN DEFINITIONS AND INDEX TO DEFINITIONS.

1.1 Unless otherwise defined herein, any capitalized terms used herein shall have the meanings ascribed in the Factoring Agreement.  All terms used herein that are defined in the Uniform Commercial Code shall have the meanings ascribed thereto therein.  As used herein, the following terms shall have the following meanings:

1.1.1 **"Advance"** -- Any loan by Secured Party to Debtor hereunder.

1.1.2 **"Allowable Amount"** - The lesser of:

(a) The sum of:

(i) 70% of the Value of Debtor's Eligible Finished Goods Inventory;

(ii) 60% of the Value of Debtor's Eligible Filling Room Inventory; plus

(iii) 55% of the Value of Debtor's Eligible Off Site Inventory, and

(b) The Maximum Amount.

1.1.3 **"Borrowing Base Certificate"** - A request for an Advance, in a form acceptable to Secured Party, calculating Debtor's loan availability hereunder.

BN 835515v2

This Inventory Financing Agreement is at all times subject to the liens in favor of Bank of America, N.A.

1.1.4 **"Collateral"** – Any collateral now or hereafter securing the obligations of Debtor to Secured Party.

1.1.5 **"Default Rate"** – The maximum rate allowable by law.

1.1.6 **"Due Date"** – The earlier of (i) termination of the Factoring Agreement or (ii) payment in full of the Obligations other than then obligations arising hereunder.

1.1.7 **"Eligible Filling Room Inventory"** - Finished Goods Inventory of Debtor which would be Eligible Finished Good Inventory but for Section 1.1.8(e) hereof. In calculating Eligible Filling Room Inventory, Raw Material Inventory or Packaging may be included only to the extent that the then existing supply of Raw Material Inventory or Packaging is sufficient to create one or more finished goods.

1.1.8 **"Eligible Finished Good Inventory"** – Finished goods Inventory of Debtor which is:

(a) Subject to Secured Party's first priority, perfected security interest;

(b) In the actual physical possession of Debtor;

(c) Not owned by Debtor for more than 180 days.

(d) Otherwise acceptable to Secured Party in its reasonable sole discretion; and

(e) Placed in packaging and ready in all respects for shipment to Debtor's customers.

1.1.9 **"Eligible Off Site Inventory"** – Finished Goods Inventory of Debtor which would be Eligible Finished Good Inventory but for Section 1.1.8(b), and which is in the possession of Eligible Vendors which have acknowledged in writing, in substance satisfactory to Secured Party that each is holding the subject Inventory for the account of Secured Party.

1.1.10 **"Eligible Vendor"** – Vendors, satisfactory to Secured Party, in Secured Party's sole discretion.

1.1.11 **"Event of Default"** – Default in the performance of any obligation now or hereafter owing by Debtor to Secured Party, including but not limited to obligations arising hereunder or under the Factoring Agreement.

1.1.12 **"Factoring Agreement"** - That certain Factoring and Security Agreement between Debtor and Secured Party, dated June 20, 2004, as amended.

1.1.13 **"Interest Rate"** - The Funds Usage Rate plus the Monitoring Fee.

BN 835515v2

1.1.14 **"Loan Balance"** – The unpaid balance of Advances and all other charges owing by Debtor to Secured Party hereunder.

1.1.15 **"Monitoring Fee"** – 0.0342% per day.

1.1.16 **"Packaging"** – Inventory of Debtor which is used as packaging (whether edible or inedible) for Raw Material Inventory in manufacturing finished goods.

1.1.17 **"Raw Material Inventory"** - Raw material inventory of Debtor other than Packaging.

1.1.18 **"Termination Date"** – means the date of termination of the Factoring Agreement.

1.1.19 **"Value"** – The lower of cost or market.

## 2. <u>LOANS TO DEBTOR.</u>

2.1 **Loans.** Subject to the terms and conditions of this Agreement, from the date on which this Agreement becomes effective until the Termination Date, Secured Party, may, in its sole discretion, from time to time, at the request of Debtor, make Advances to Debtor so long as, before and after such loan the Loan Balance does not exceed the Allowable Amount.

2.2 **Repayment.**

2.2.1 Debtor shall immediately repay any portion of the Loan Balance that exceeds the Allowable Amount.

2.2.2 The Loan Balance shall be due and payable without notice or demand on the date of termination of the Factoring Agreement.

2.3 **Borrowing Base Certificate.** Each request from Debtor for an Advance shall be accompanied by a Borrowing Base Certificate, completed and signed by Debtor.

2.4 **Factoring Account.** All Advances may be made, in Secured Party's sole discretion, by a credit by Secured Party to Debtor's account under the Factoring Agreement and all sums due hereunder may be debited to said account when due.

## 3. <u>INTEREST.</u>

3.1 **Basic Interest.** Interest on the Loan Balance shall be payable monthly, in arrears, shall be computed at the Interest Rate, and shall be due on the first day of each month following the accrual thereof.

3.2 **Debit to Loan Balance.** Secured Party may debit the Loan Balance on the first day of each month for interest accrued hereunder during the preceding month.

BN 835515v2

3.3 **Default Interest.**  Immediately upon the occurrence of an Event of Default, interest shall accrue and be payable at the Default Rate.  Secured Party's failure to assess interest at the Default Rate as provided hereunder shall not be deemed a waiver by Secured Party to charge such Default Rate.

3.4 **Calculation of Interest.**  All interest charged hereunder shall be computed on the basis of a three hundred sixty (360) day year for the actual number of days elapsed.

## 4.  COVENANTS, REPRESENTATIONS AND WARRANTIES BY DEBTOR.

4.1 **Inventory Listing.**  On or before the fifth Business Day of each month, and whenever requested by Secured Party, Debtor shall furnish to Secured Party, in form and substance satisfactory to Secured Party, a listing of all Debtor's Inventory, based upon a physical count.  In addition, Debtor shall provide an Inventory listing on a weekly basis, and with the submission of each Borrowing Base Certificate.

4.2 **Inspections.**  During usual business hours, permit Secured Party, without notice to Debtor, to periodically:

4.2.1 Have access to all premises where Debtor's Inventory is located for the purposes of inspecting (and removing, if after the occurrence of an Event of Default) any of the Eligible Inventory, and

4.2.2 To inspect, audit, make copies of, and make extracts from Debtor's records as Secured Party may request.

4.3 **Use of Debtor's Employees and Assets.**  Use any of Debtor's personnel, equipment, including computer equipment, programs, printed output and computer readable media, supplies and premises for the enforcement of any of Secured Party's rights regarding Debtor's Inventory.

4.4 **Maintenance of Insurance.**

4.4.1 Debtor will maintain with financially sound and reputable insurers insurance with respect to its properties and business against such casualties and contingencies as shall be in accordance with general practices of businesses engaged in similar activities in similar geographic areas.  Such insurance shall be in such minimum amounts that the Debtor will not be deemed a co-insurer under applicable insurance laws, regulations, and policies and otherwise shall be in such amounts, contain such terms, be in such forms and be for such periods as may be reasonably satisfactory to the Secured Party.  In addition, all such insurance shall be payable to the Secured Party under a Secured Party Loss Payable Endorsement.  Without limiting the foregoing, the Debtor will:

(a) Keep all of its physical property insured with casualty or physical hazard insurance on an "all risks" basis, with broad form flood and earthquake coverage and electronic data processing coverage, with a full replacement cost

Page 4 of 10

endorsement and an "agreed amount" clause in an amount equal to 100% of the full replacement cost of such property;

    (b) Maintain, in amounts and with deductibles equal to those generally maintained by businesses engaged in similar activities in similar geographic areas, general public liability insurance against claims of bodily injury, death, or property damage occurring, on, in or about the properties of the Debtor; business interruption insurance; and product liability insurance.

    4.4.2 In the event that Debtor fails to maintain such insurance, Secured Party may obtain such insurance at Debtor's expense, and, after an Event of Default, to adjust or settle any claim or other matter under or arising pursuant to such insurance or to amend or cancel such insurance.

## 5. **EVENT OF DEFAULT.** Upon the occurrence of an Event of Default, all sums due hereunder shall be immediately due and payable without notice or demand.

## 6. **STANDARDS FOR EXERCISING REMEDIES.**

    6.1 To the extent that applicable law imposes duties on the Secured Party to exercise remedies in a commercially reasonable manner, the Debtor acknowledges and agrees that it is not commercially unreasonable for the Secured Party:

    6.1.1 To not incur expenses to prepare Debtor's Inventory for disposition or otherwise to complete raw material or work in process into finished goods or other finished products for disposition;

    6.1.2 To fail to obtain third party consents for access to the Eligible Inventory to be disposed of, or to obtain or, if not required by other law, to fail to obtain governmental or third party consents for the collection or disposition of the Eligible Inventory to be collected or disposed of;

    6.1.3 To advertise dispositions of Collateral through publications or media of general circulation, whether or not the Collateral is of a specialized nature;

    6.1.4 To hire one or more professional auctioneers to assist in the disposition of Collateral, whether or not the collateral is of a specialized nature;

    6.1.5 To dispose of Collateral by using Internet sites that provide for the auction of assets of the types included in the Collateral or that have the reasonable capability of doing so, or that match buyers and sellers of assets;

    6.1.6 To dispose of assets in wholesale rather than retail markets;

    6.1.7 To disclaim all disposition warranties; or

BN 835515v2

6.1.8 To purchase insurance or credit enhancements to insure the Secured Party against risks of loss, collection or disposition of Collateral or to provide to the Secured Party a guaranteed return from the collection or disposition of Collateral.

6.2 Debtor acknowledges that the purpose of this Section 6 is to provide non-exhaustive indications of what actions or omissions by the Secured Party would not be commercially unreasonable in the Secured Party's exercise of remedies against the Collateral and that other actions or omissions by the Secured Party shall not be deemed commercially unreasonable solely on account of not being indicated in this Section. Without limitation upon the foregoing, nothing contained herein shall be construed to grant any rights to the Debtor or to impose any duties on the Secured Party that would not have been granted or imposed by this Agreement or by applicable law in the absence of this Section 6.

**7. PROCEEDS AND EXPENSES OF DISPOSITIONS.** Debtor shall pay to the Secured Party on demand any and all expenses, including reasonable attorneys' fees and disbursements, incurred or paid by the Secured Party in protecting, preserving, or enforcing the Secured Party's rights under or in respect of any of the Obligations or any of the Collateral. After deducting all of said expenses, the residue of any proceeds of collection or sale of the Obligations or Collateral shall, to the extent actually received in cash, be applied to the payment of the Obligations in such order or preference as the Secured Party may determine, notwithstanding contrary instructions received by Secured Party from the Debtor or any other third party.

**8. LIQUIDATION SUCCESS PREMIUM.** If Debtor shall substantially cease operating as a going concern, and the proceeds of Collateral created after the occurrence of an Event of Default (the "Default") are in excess of the Obligations at the time of Default, Debtor shall pay to Secured Party a liquidation success premium of ten percent of the amount of such excess.

**9. ENFORCEMENT.** This Agreement and all agreements relating to the subject matter hereof are the product of negotiation and preparation by and among each party and its respective attorneys, and shall be construed accordingly. Accordingly, no provision of this Agreement shall be construed against or interpreted to the disadvantage of any party hereto by any court or other governmental or judicial party by reason of such party having, or being deemed to have, structured, drafted, or dictated such provision.

**10. AMENDMENT.** Neither this Agreement nor any provisions hereof may be changed, waived, discharged, or terminated, nor may any consent to the departure from the terms hereof be given, orally (even if supported by new consideration), but only by an instrument in writing signed by all parties to this Agreement. Any waiver or consent so given shall be effective only in the specific instance and for the specific purpose for which given.

**11. NO LIEN TERMINATION WITHOUT RELEASE.** In recognition of the Secured Party's right to have its attorneys' fees and other expenses incurred in connection with this Agreement secured by the Collateral, notwithstanding payment in full of all Obligations by Debtor, Secured Party shall not be required to record any terminations or satisfactions of any of Secured Party's liens on the Collateral unless and until Debtor has executed and delivered to Secured Party a general release in a form reasonably satisfactory to Secured Party. Debtor understands that this

BN 835515v2

provision constitutes a waiver of its rights under §§9-509(d)(2) and 9-513 of the UCC. The above shall apply to all circumstances now or hereafter contemplated, except in the event of the willful misconduct of the secured party, as determined in a court of law.

12. **SURVIVAL.** All representations, warranties, and covenants contained in this Agreement shall be and remain effective for so long as this Agreement has not been terminated in accordance with its terms or the Loan Balance remains outstanding.

13. **NO WAIVER; CUMULATIVE NATURE OF RIGHTS AND REMEDIES.** No failure to exercise and no delay in exercising any right, power, or remedy hereunder shall impair any right, power, or remedy which Secured Party may have, nor shall any such delay be construed to be a waiver of any of such rights, powers, or remedies, or any acquiescence in any breach or default hereunder; nor shall any waiver by secured party of any breach or default by Debtor hereunder be deemed a waiver of any default or breach subsequently occurring. All rights and remedies granted to Secured Party hereunder shall remain in full force and effect notwithstanding any single or partial exercise of, or any discontinuance of action begun to enforce, any such right or remedy. The rights and remedies specified herein are cumulative and not exclusive of each other or of any rights or remedies which secured party would otherwise have. Any waiver, permit, consent or approval by secured party of any breach or default hereunder must be in writing and shall be effective only to the extent set forth in such writing and only as to that specific instance.

14. **SEVERABILITY.** In the event any one or more of the provisions contained in this Agreement is held to be invalid, illegal, or unenforceable in any respect, then such provision shall be ineffective only to the extent of such prohibition or invalidity, and the validity, legality, and enforceability of the remaining provisions contained herein shall not in any way be affected or impaired thereby.

*Reasonable and Relative* TB

15. **REIMBURSEMENT OF EXPENSES.** Debtor agrees to reimburse Secured Party on demand for the actual amount of all costs and expenses, including attorneys' fees, which Secured Party incurred or may incur in (a) negotiating, preparing, or administering this Agreement and any documents prepared in connection herewith, all of which shall be paid contemporaneously with the execution hereof, and (b) protecting, preserving, or enforcing any lien, security interest, or other right granted by Debtor to Secured Party or arising under applicable law, whether or not suit is brought. Any such costs and expenses incurred subsequent to the execution hereof shall become part of the Obligations when incurred and may be added to the outstanding principal amount due hereunder.

16. **ENTIRE AGREEMENT.** This Agreement supersedes all prior or contemporaneous agreements and understandings between said parties, verbal or written, express or implied, relating to the subject matter hereof. No promises of any kind have been made by Secured Party or any third party to induce debtor to execute this Agreement. No course of dealing, course of performance or trade usage, and no parole evidence of any nature, shall be used to supplement or modify any terms of this Agreement.

BN 835515v2

17. **CHOICE OF LAW.** This Agreement and all transactions contemplated hereunder and/or evidenced hereby shall be governed by, construed under, and enforced in accordance with the internal laws of the State of Florida.

18. **CONSTRUCTION OF AGREEMENT.** Notwithstanding anything to the contrary set forth in this Agreement, in no event shall the rate or amount of fees or other charges that are deemed interest under applicable law and that are charged or collected hereunder exceed the maximum amount chargeable under applicable law (it being the intent hereof that secured party not contract or receive and debtor not pay interest in excess of the maximum authorized by applicable law); and, if a court of competent jurisdiction determines that Secured Party has charged or collected interest in excess of the highest lawful rate, secured party shall promptly refund such excess to debtor and shall not otherwise be penalized.

19. **JURY TRIAL WAIVER. IN RECOGNITION OF THE HIGHER COSTS AND DELAY WHICH MAY RESULT FROM A JURY TRIAL, THE PARTIES HERETO WAIVE ANY RIGHT TO TRIAL BY JURY OF ANY CLAIM, DEMAND, ACTION, OR CAUSE OF ACTION (A) ARISING HEREUNDER, OR (B) IN ANY WAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE DEALINGS OF THE PARTIES HERETO OR ANY OF THEM WITH RESPECT HERETO, IN EACH CASE WHETHER NOW EXISTING OR HEREAFTER ARISING, AND WHETHER SOUNDING IN CONTRACT OR TORT OR OTHERWISE; AND EACH PARTY FURTHER WAIVES ANY RIGHT TO CONSOLIDATE ANY SUCH ACTION IN WHICH A JURY TRIAL HAS BEEN WAIVED WITH ANY OTHER ACTION IN WHICH A JURY TRIAL CANNOT BE OR HAS NOT BEEN WAIVED; AND EACH PARTY HEREBY AGREES AND CONSENTS THAT ANY SUCH CLAIM, DEMAND, ACTION OR CAUSE OF ACTION SHALL BE DECIDED BY COURT TRIAL WITHOUT A JURY, AND THAT ANY PARTY HERETO MAY FILE AN ORIGINAL COUNTERPART OR A COPY OF THIS SECTION WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF THE PARTIES HERETO TO THE WAIVER OF THEIR RIGHT TO TRIAL BY JURY.**

20. **VENUE; JURISDICTION.** The parties agree that any suit, action, or proceeding arising out of the subject matter hereof, or the interpretation, performance, or breach of this Agreement, shall, if secured party so elects, be instituted in the united states district court for the middle district of Florida or any court of the State of Florida located in orange county (each an "Acceptable Forum"). Each party agrees that the Acceptable Forums are convenient to it, and each party irrevocably submits to the jurisdiction of the Acceptable Forums, irrevocably agrees to be bound by any judgment rendered thereby in connection with this Agreement, and waives any and all objections to jurisdiction or venue that it may have under the laws of the State of Florida or otherwise in those courts in any such suit, action, or proceeding. Should such proceeding be initiated in any other forum, debtor waives any right to oppose any motion or application made by Secured Party as a consequence of such proceeding having been commenced in a forum other than an Acceptable Forum.

21. **NOTICE.** All notices required to be given to any party shall be deemed given upon the first to occur of (i) deposit thereof in a receptacle under the control of the United States Postal

BN 835515v2

Service, properly addressed and postage prepaid, (ii) transmittal by electronic means to a receiver under the control of such party; or (iii) actual receipt by such party or an employee or agent of such party.

For the purposes hereof, notices hereunder shall be sent to the following addresses, or to such other addresses as each such party may in writing hereafter indicate:

## DEBTOR

ADDRESS:    4215 Wendell Drive SW, Suite 203
                Atlanta, GA 30336
OFFICER:    Armand J. Kramedjian
FAX NUMBER:  404-699-0698

## SECURED PARTY

ADDRESS:    1403 West Colonial Drive, Suite B
                Orlando, FL 32804
OFFICER:    Maxwell Eliscu, President
FAX NUMBER:  407-206-0025

22. **COUNTERPARTS.** This Agreement may be signed in any number of counterparts, each of which shall be an original, with the same effect as if all signatures were upon the same instrument. Delivery of an executed counterpart of the signature page to this Agreement by facsimile shall be effective as delivery of a manually executed counterpart of this Agreement, and any party delivering such an executed counterpart of the signature page to this Agreement by facsimile to any other party shall thereafter also promptly deliver a manually executed counterpart of this Agreement to such other party, provided that the failure to deliver such manually executed counterpart shall not affect the validity, enforceability, or binding effect of this Agreement.

Page 9 of 10

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed and delivered by their respective officers thereunto duly authorized as of the date first above written.

DEBTOR:

INNOVATIVE CANDY CONCEPTS, LLC

By: _____
Name: Terrance F. O'Brien
Title: V.P.

SECURED PARTY:

LSQ FUNDING GROUP L.C.

By: _____
Name: A. Maxwell Eliscu
Title: President

BN 835515v2

## AMENDMENT TO FACTORING AND SECURITY AGREEMENT

As of January 1, 2009, the following terms and conditions of the Factoring and Security Agreement dated June 07, 2004 by and between LSQ Funding Group, L.C. and Innovative Candy Concepts, LLC, are hereby amended to reflect the following changes and/or additions:

31.9. "Discount Service Fee Rate" - 0.059% of the gross Face Amount of each invoice purchased.

AGREED AND ACCEPTED BY:

Innovative Candy Concepts, LLC.

By: _____

Name: _____

Title: _____

Date: _____

LSQ Funding Group, L.C.

A. Maxwell Eliscu, President

## AMENDMENT TO FACTORING AND SECURITY AGREEMENT

As of January 14, 2010, the following terms and conditions of the Factoring and Security Agreement dated June 24, 2004 by and between LSQ Funding Group, L.C. and Innovative Candy Concepts, LLC. are hereby amended to reflect the following changes and/or additions:

29.2. For the purposes hereof, notices hereunder shall be sent to the following addresses, or to such other addresses as each such party may in writing hereafter indicate:

**SELLER**

ADDRESS:

3765 Atlanta Industrial, Suite A
Atlanta, GA 30331

OFFICER: Armand J. Kramedjian

FAX: 404-699-8834

AGREED AND ACCEPTED BY:

Innovative Candy Concepts, LLC

By: _____

Name: _Armand J. Kramedjian_

Title: _President / CEO_

Date: _1-20-10_

LSQ Funding Group, L.C.

A. Maxwell Bliscu, President

## AMENDMENT TO FACTORING AND SECURITY AGREEMENT

As of June 18, 2010, the following terms and conditions of the Factoring and Security Agreement dated June 07, 2004 by and between LSQ Funding Group, L.C. and Innovative Candy Concepts, LLC, are hereby amended to reflect the following changes and/or additions:

31.9. **"Discount Service Fee Rate"** - 0.065% of the gross Face Amount of each invoice purchased.

AGREED AND ACCEPTED BY:

Innovative Candy Concepts, LLC.

By: _____

Name: _Armine Khamedjian_____

Title: _President_____

Date: _6-18-2010_____

LSQ Funding Group, L.C.

A. Maxwell Eliscu, President